TRANS INTERNATIONAL AIRLINES,
INC., Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, ETC., AIRLINE DIVI-
SION, Teamster Local 2707, Marvin G.
Griswold, Teamster Local 732, Airline
Pilots Association, International, De-
fendants.

No. C–77–2011 RFP.

United States District Court,
N. D. California.

Sept. 29, 1977.

Michael R. Marron, Robert T. Fries, Steinhart, Goldberg, Feigenbaum & Ladar, San Francisco, Cal., Robert W. Ashmore, Fisher & Phillips, Atlanta, Ga., for plaintiff Trans Intern. Airlines.

Kenneth N. Silbert, Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., Roland P. Wilder, Jr., Washington, D. C., John Paul Jennings, Jennings, Gartland & Tilly, San Francisco, Cal., for defendants Intern. Broth. of Teamsters, etc., et al.

## MEMORANDUM AND ORDER RE FLIGHT ENGINEERS AND PILOTS

PECKHAM, Chief Judge.

This case raises the issue of this court's power to enjoin sympathy strikes under the Railway Labor Act (RLA). The plaintiff, Trans International Airlines, Inc. (TIA), is a supplemental air carrier, and is the surviving corporation of the merger of Saturn Airways, Inc. (Saturn) and TIA on November 30, 1976. All of the flight engineers presently employed by TIA are represented by defendant International Brotherhood of Teamsters (Teamsters), but under two different collective-bargaining agreements. Those flight engineers, as well as pilots and navigators, who were employed by TIA before the merger are governed by an agreement that went into effect July 21, 1974, while flight engineers formerly employed by Saturn come under an agreement effective November 17, 1974.

TIA's pilots are similarly divided. The pre-merger TIA pilots were represented by the Teamsters and they still work under the July 21, 1974, contract. The former Saturn pilots, on the other hand, were represented by the Airline Pilots Association (ALPA), and they are governed by an agreement effective May 23, 1972. Since the merger, all of TIA's pilots have been represented by ALPA. All three of these collective-bargaining agreements are still in force, although they have been subsequently modified by letter agreements not relevant to this dispute.

The issues to be decided in this case involve the attempts by both groups of flight engineers and both groups of pilots to engage in a sympathy strike in support of a primary strike by TIA's flight attendants that commenced on September 9, 1977.

The facts surrounding that labor dispute are fully set out in the court's memorandum and order of September 26, 1977, case No. C–77–2010 RFP. Prior to the commencement of the strike, on September 7, 1977, this court issued a temporary restraining order prohibiting all flight engineers from refusing to cross any picket lines. The next day, September 8, that order was substantially modified to restrain only former Saturn flight engineers and flight engineers working on TIA's military flights from honoring any picket lines. After listening to further argument on this matter at a hearing held on September 15, 1977, the court must now decide whether a preliminary injunction should issue. At the same time, the court also has before it TIA's application for a temporary restraining order to halt a sympathy strike by TIA pilots.

1. PRE–MERGER TIA FLIGHT ENGINEERS AND PILOTS
(Agreement of July 21, 1974)
"SECTION 21
A. [General No Strike Clause] During the term of this Agreement, the Union shall not authorize, cause, sanction or engage in any strike, picketing, slowdown or stoppage of work.

. . . .

D. [Military No Strike Clause] The Union further agrees that the Crewmembers will continue to perform all duties which are necessary to enable the Company to operate flights for or in support of traffic sponsored by the Department of Defense of the United States of America, even though such Crewmembers withdraw from commercial airline service because of a dispute arising out of negotiations for a new contract after the expiration date of this Agreement and/or during and after all procedures of the Railway Labor Act have been exhausted,

. . .

E. [Picket Line Clause] It shall not be a violation of this Agreement, and it shall not be a cause for discharge or disciplinary action in the event a Crewmember refuses to go through or work behind a legal primary picket line maintained by the Union in connection with a dispute between the Company and the Union involving any flight personnel represented by the Union."

FORMER SATURN FLIGHT
ENGINEERS
(Agreement of November 17, 1974)
"Section 24

. . . . .

L. [General No Strike Clause] The Company will not lock out any employees covered by

Whether or not these four groups of TIA employees have the right to engage in a sympathy strike must be determined by the terms of the applicable collective-bargaining agreement. The three agreements contain a variety of relevant language—general no-strike pledges, picket line clauses, and military no-strike provisions.[1] All parties agree that any dispute over the proper construction of these clauses is a "minor dispute" under the RLA, which either the employer or the union may take to binding arbitration. RLA Section 3, First, 45 U.S.C. § 153, First. The Teamsters and ALPA argue that their members have the right to honor the flight attendants' picket lines under the terms of the three applicable collective-bargaining agreements. As to all three agreements, TIA disagrees with the unions' reading of the agreements, and wishes to take the dispute to arbitration.

this Agreement and the Union and its members, individually and collectively, agree that they will not authorize or take part in any strike or picketing at the Company's premises during the life of this Agreement, until the procedures for settling disputes involving employees covered by this Agreement, as provided for by the Railway Labor Act, have been exhausted by both parties.

. . . .

P. [Military No Strike Clause] Conduct of Military Operations—It is mutually agreed that during the term of the Agreement between the Company and its Flight Engineers as represented by the Union, that the Flight Engineers will not engage in any strike or work stoppage on purely military operations conducted by the Company."

FORMER SATURN PILOTS
(Agreement of May 23, 1972)
This contract contains no general no-strike agreement as such, although it does, in Section 26 C 12, reserve to each party all the rights and privileges accorded under the provisions of the Railway Labor Act.
"Section 29

. . . .

K. [Military No Strike Clause] In the interest of national defense and in the event of the withdrawal from service from Saturn Airways, Inc., of crew members covered by this agreement, essential military services shall be permitted to operate; provided however, that this policy shall only pertain to those flights that are solely and completely military in nature and whose entire cargo is comprised of military commodities or military personnel."

Central to TIA's claim for relief is its assertion that the Supreme Court's decision in *Brotherhood of Railroad Trainmen v. Chicago River & I. R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), requires this court to enjoin any actions by the unions which would alter the status quo pending arbitration of this minor dispute. A brief look at the historical development of this area of labor law is necessary to determine the correctness of TIA's assertion.

The *Chicago River* decision, *supra*, created an exception to the general command of section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, that federal courts should not issue injunctions in labor disputes. The Court held there that an injunction could issue to prevent a strike while minor disputes were arbitrated as required by the RLA. The minor disputes in that case were 21 individual grievances; claims for additional compensation or for reinstatement. The Court's reasoning was that it was the intent of Congress to bring about stability in the labor relations of "this most important national industry," where a strike meant disruption and economic injury to a great many people. Therefore, Congress saw fit to ban outright strikes within the industry over individual grievances. Although the Court spoke in general terms, using the statutory phrase "minor disputes," it is evident that the Court was primarily concerned with preventing strikes over everyday grievances.[2] In the years since this decision, however, the rule of *Chicago River* has been applied very broadly. Federal courts have routinely issued injunctions against any strike action, including sympathy strikes, where any minor dispute has been found to exist. *Hughes Air Corp. v. Airline Pilots Assoc.*, No. 71–3034 (9th Cir., Jan. 7, 1972); *Northwest Airlines, Inc. v. Airline Pilots Assoc.*, 442

F.2d 246 (8th Cir. 1970), *reaffirmed* 442 F.2d 251 (1971), *cert. denied*, 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971).[3]

The analogous situation under the National Labor Relations Act, on the other hand, was originally resolved the opposite way. *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), held that a strike over an issue the parties expressly agreed to arbitrate could not be enjoined because of the prohibition of section 4 of the Norris-LaGuardia Act. However, the Court in *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), overruled *Sinclair Refining* and stated in broad language that a no-strike clause could be enforced by a federal court injunction pending arbitration under a broad arbitration clause. *Boys Markets*, like *Chicago River* before it, was thereafter applied automatically by most federal courts. If a broad arbitration clause was accompanied by a no-strike pledge and the dispute was arguably arbitrable, an injunction would almost invariably issue, even against sympathy strikes. *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs*, 502 F.2d 321 (3d Cir. 1974) (en banc); *Island Creek Coal Co. v. Mine Workers*, 507 F.2d 650 (3d Cir. 1975); *Armco Steel Corp. v. Mine Workers*, 505 F.2d 1129 (4th Cir. 1974); *Valmac Industries v. Food Handlers*, 519 F.2d 263 (8th Cir. 1975), *vacated* 428 U.S. 906, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976). *Contra, Amstar Corp. v. Meat Cutters*, 468 F.2d 1372 (5th Cir. 1972).

This mechanical approach was recently rejected outright by the Supreme Court in *Buffalo Forge, Inc. v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). *Buffalo Forge* explained that *Boys Markets* established only a narrow exception to the general prohibition of the Nor-

---

**2.** This can be most clearly seen in the court's characterization of minor disputes as "controversies over the meaning of an existing collective-bargaining agreement in a particular fact situation, generally involving only one employee." 353 U.S. at 33, 77 S.Ct. at 637.

**3.** In 1974, this court issued a temporary restraining order in a sympathy strike situation

similar to the one in this case and involving some of the same parties. *Saturn Airways, Inc. v. International Brotherhood of Teamsters*, Civ. No. C–74–1305 RHS (N.D.Cal.1974). This decision, like those cited in the text, was pre-*Buffalo Forge* and is distinguishable for the reasons set forth in this memorandum.

ris-LaGuardia Act. In the case of sympathy strikes, where the underlying issue (the primary strike) is not arbitrable, the Court held that Norris-LaGuardia still prohibits the issuance of an injunction to halt the strike. There are compelling reasons for reaching this result. If the employer can obtain an injunction just by raising an arbitrable issue of contract interpretation, then sympathy strikes could be enjoined in every case pending arbitration. It is almost always possible to dispute in good faith the meaning of even the clearest contract language intended to give a union the right to honor another's picket lines. A union's hard won contractual right to engage in sympathy strikes would be lost for that critical period at the beginning of the primary strike when support for the strike from other unions is generally most crucial. The core meaning of *Buffalo Forge* then, is that sympathy strikes present a different situation than strikes over grievances concerning the terms and conditions of employment and that the logic of *Boys Markets* is thus not applicable to the sympathy strike situation. Rather, a fresh analysis of the situation is required.

The court can discern no reason why this teaching of *Buffalo Forge* should not be equally applicable to the RLA and the *Chicago River* decision. Although there are fundamental differences between the RLA and the NLRA, and only rough analogies may be drawn between the two statutory schemes, nevertheless the core reasons for reaching the *Buffalo Forge* result are just as compelling in the RLA context as under the NLRA. This case presents a situation greatly resembling that in *Buffalo Forge*. In fact, the former Saturn flight engineers and pilots are identically situated with the union members in *Buffalo Forge*. These employees have a no-strike pledge in their agreement, but contend that this does not prevent them from honoring the flight attendants' picket lines. The pre-merger TIA flight engineers and pilots, on the other hand, present an even more compelling case for reaching the *Buffalo Forge* result, for their contract contains an express provision permitting the honoring of picket lines. If

TIA can obtain an injunction against a sympathy strike here by simply disputing the interpretation of the picket line clause, these employees will have effectively lost the benefit of this bargained-for contract provision.

The result reached here does not conflict with the policies underlying the RLA and the *Chicago River* decision. The RLA provides for the mandatory arbitration of minor disputes, and *Chicago River* permits an injunction pending their arbitration, in order to minimize interruptions in the operation of the vital industries covered by the RLA. However, the RLA does permit strikes in "major disputes," disputes stemming from the bargaining over a new contract. The primary strike by the flight attendants which underlies this case is just such a permitted strike, for the RLA's prerequisites to striking have all been completed. Commerce is already being disrupted and TIA already has a strike on its hands with the full blessing of the RLA. A sympathy strike possibly may enhance the effectiveness or the extent of the work stoppage, but there is by definition already an underlying primary strike. Disagreement over a union's right to honor picket lines is a minor dispute within the RLA definition. But a sympathy strike situation under the RLA will always be associated with a related major dispute, and it has elements in common with the major dispute that clearly distinguish a sympathy strike from other types of minor disputes. The court thus finds the rationale of *Chicago River* to be inapplicable here in light of the teaching of *Buffalo Forge* and the compelling reasons for following that decision outlined above.

In one important respect, however, the facts of this case significantly differ from those in *Buffalo Forge*. All three collective-bargaining agreements before the court contain a special military no-strike clause in addition to any general no-strike pledge. Both the agreements for the pre-merger TIA flight engineers and pilots, and for the former Saturn pilots clearly state that military flights are to be continued even if the union lawfully strikes all other

flights. These special provisions are required by the terms of the Department of Defense contracts with TIA in order to assure continued service for the military. It would be going well beyond the facts of *Buffalo Forge* for this court to hold that because the union can generate a minor dispute requiring arbitration over the meaning of these clauses, no injunction should issue pending arbitration. This would pervert *Buffalo Forge*, for the employer would then lose the benefit of its bargain that military flights would continue during a strike. Furthermore, since the flight attendants have a similar clause in their agreement and accordingly have been enjoined from extending their strike to military flights, any sympathy strike of military flights would do more than just supplement a preexisting work stoppage. Rather, such a sympathy strike would involve a separate and distinct work stoppage in an area of TIA's operations exempt from the primary strike. This would strongly conflict with the aim of the RLA to reduce strikes to an absolute minimum, and the court thus does not feel that an extension of *Buffalo Forge* to the situation regarding military flights would be appropriate. Although the court holds that the principles of *Buffalo Forge* do apply to the RLA, the differences between the statutory schemes of the RLA and NLRA demand great caution in applying that case beyond its facts to the RLA context.

Accordingly, it is hereby ORDERED that the defendant International Brotherhood of Teamsters, as representative for all of TIA's present flight engineers, their officers, agents, representatives, members, servants, employees, and any and all persons acting in concert with them, are hereby enjoined from authorizing, inducing, causing participation in, or otherwise aiding and abetting in any concerted refusal to work, sympathy strike, or honoring of picket lines with respect to military flights under the military no-strike clauses of the applicable collective-bargaining agreements. Plaintiff TIA's motion for a preliminary injunction with respect to its flight engineers is hereby denied in all other respects.

Furthermore, it is hereby ORDERED that defendant Airline Pilots Association, as representative for all of TIA's present pilots, their officers, agents, representatives, members, servants, employees, and any and all persons acting in concert with them, are hereby restrained from authorizing, inducing, causing participation in, or otherwise aiding and abetting in any concerted refusal to work, sympathy strike, or honoring of picket lines with respect to military flights under the military no-strike clauses of the applicable collective-bargaining agreements. Plaintiff TIA's motion for a temporary restraining order with respect to its pilots is hereby denied in all other respects. This temporary restraining order to remain in effect until a determination is made with respect to TIA's motion for a preliminary injunction, but in any case for no more than 10 days.